## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**PATRICIA CALDERON-IBARRA DE TALAMANTES,**

        **Plaintiff,**

**v.**                                    **CIV 09-478 MCA/LAM**

**UNITED STATES OF AMERICA through its agency, CBP Border Patrol, JOHN DOE & OTHER UNKNOWN DEFENDANTS, BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF OTERO, NEW MEXICO, DEPUTY KENNETH FIGUEROA, DEPUTY RICARDO RODRIGUEZ, and DEPUTY ROB HANSEN,**

        **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion For Partial Summary Judgment Based On Qualified Immunity* [Doc 30] and *Plaintiff's Motion For Relief Under Fed Rules Civ Proc R 56(f)* [Doc 44].  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendants' *Motion* and denies Plaintiff's *Motion*.

## I.    BACKGROUND

At issue in this lawsuit are four encounters between Plaintiff and individual Otero County deputies, as well as assorted members of the United States Border Patrol.  The facts of each episode will be related as they become relevant to the legal analysis.

On May 13, 2009, Plaintiff, Patricia Calderon-Ibarra de Talamantes, filed suit against the United States of America through its agency CBP Border Patrol, a number of John Doe defendants, the Otero Board of County Commissioners, and Otero County Deputies Ricardo Carrera, K. Figueroa, Ricardo Rodrigeuz, and Rob Hansen.  [See Doc 1 (*Plaintiff's Original Petition For Damages* (*Petition*)]  Plaintiff settled her claims against the United States of America, CBP Border Patrol, and "any and all named or unnamed federal employees of these agencies."  [See Doc 51]  Accordingly, the only remaining defendants are the Otero County Board of Commissioners and the Otero County Deputies.

Plaintiff's *Petition* makes ten claims against the individual Otero County deputies. [Doc 1 at 15]  By stipulation, Count XII for intentional infliction of emotional distress, has been dismissed.  [Doc 10]  The remaining counts are as follows:  Count I, for Fourth Amendment violations, Count II for Equal Protection violations, Count III for false imprisonment contrary to the Due Process Clause, Count IV for violations of substantive Due Process, Count V for conspiracy to violate civil rights under 42 U.S.C. § 1985, Count VI for false arrest and false imprisonment contrary to state law, County VII for malicious prosecution contrary to state law, Count X for assault and battery, and Count XI for negligence.  [Doc 30 at 1; Doc 1 at 8-10, 14]  On February 26, 2010, Plaintiff filed a *Notice Of Non-Suit Of Defendant Deputy Ricardo Carrera* [Doc 28], thus releasing her claims against Deputy Carrera.  For simplicity, in this *Opinion*, the Court refers collectively to the remaining Otero County individual Defendants—Figueroa, Hansen,

and Rodriguez—as "Defendants."

On March 9, 2010, Defendants filed *Defendant's Motion For Partial Summary Judgment Based On Qualified Immunity*. [Doc 30] Plaintiff has responded to Defendants' *Motion*, but also seeks leave to conduct discovery pursuant to Fed.R.Civ.P. 56(f). [See Doc 38 (*Plaintiff's Corrected Response In Opposition To Defendants' Motion For Partial Summary Judgment Based On Qualified Immunity*); Doc 44 (*Plaintiff's Motion For Relief Under Fed Rules Civ Proc 56(f)*)] On April 20, 2010, United States Magistrate Judge Lourdes A. Martinez granted Defendants' *Motion To Stay Proceeding Pending Outcome Of County Defendants' Motion For Summary Judgment* [Doc 32]. [See Doc 45]

## II.   ANALYSIS

At the outset, it is necessary to address the claims against Deputy Rodriguez. Defendants state that Deputy Rodriguez was not employed by the Otero County Sheriff's Department during the time encompassed by Plaintiff's *Petition* and that as a result, all claims against him should be dismissed. [Doc 30 at 5] For support, Defendants offer evidence from Deputy Rodriguez's employment file. Plaintiff responds that she "is under the impression that an Otero Deputy with the last name of Rodriguez was one of the officers that detained her" and that "Otero County does have a Deputy with the last name Rodriguez." [Doc 38 at 9] Plaintiff points to an apparently inter-department email, which is dated August 2007 and refers to an "M. Rodriguez." [Doc 35-14] Plaintiff, however, has brought suit against "Ricardo Rodriguez," not "M. Rodriguez," and

"Ricardo Rodriguez" was terminated on December 8, 2004.  As Plaintiff's *Petition* alleges misconduct that occurred between January 2008 and March 2008, Deputy Ricardo Rodriguez could not have participated as an Otero County Deputy.  Accordingly, Deputy Rodriguez is dismissed from this action with prejudice.

The Court first addresses Defendants' summary judgment *Motion*, before turning to Plaintiff's Rule 56(f) *Motion*.

**A.      Summary Judgment, Section 1983, and Qualified Immunity**

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  See id. at 248.  Judgment is appropriate as a matter of law if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477

U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998).  "To survive summary judgment, nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (internal quotation marks and citation omitted).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

Apart from these limitations, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

42 U.S.C. § 1983 provides, in relevant part, that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Persons sued in their individual capacity under this civil-rights statute

generally are entitled to qualified immunity unless the plaintiff can establish that the

defendant's actions violated a specific federal statutory or constitutional right and that the

rights which they allegedly violated were clearly established at the time of the conduct at

issue.  See Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001); Oliver v. Woods,

209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly

established, there must be a Supreme Court or Tenth Circuit decision on point, or the

clearly established weight of authority from other courts must have found the law to be as

the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th

Cir. 1992).  But "officials can still be on notice that their conduct violates established law

even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002);

accord Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001).  The "salient

question" is whether the state of the law at the time of the incident gave the defendants

"fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

If the plaintiff fails to meet this burden, then the Court must grant the defendant

qualified immunity.  See Gross, 245 F.3d at 1156.  If the plaintiff does establish the

violation of a clearly-established constitutional or statutory right, then (for purposes of the

summary-judgment motion) the burden shifts to motion's proponent to prove that there

are no genuine issues of material fact and that they are entitled to judgment as a matter of

law.  See id.  Plaintiff has raised four categories of constitutional claims against

Defendants:  violations of the Fourth Amendment, the Fourteenth Amendment Equal

Protection Clause, and the Due Process Clause, as well as a conspiracy claim pursuant to

§ 1985.  The Court begins by considering Plaintiff's claims under the Fourth Amendment.

**1.**     **The Fourth Amendment**

The Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  It has long been recognized that "whenever a police officer

accosts an individual and restrains his freedom to walk away, he has 'seized' that person."

Terry v. Ohio, 392 U.S. 1, 16 (1968).  Thus, a person is seized within the meaning of the

Fourth Amendment "when a reasonable person would have believed that he was not free

to leave."  Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1202-03 (10th Cir. 2006)

(internal quotation marks and citation omitted).

Plaintiff raises four separate Fourth Amendment challenges.  Plaintiff contends (1)

that on January 2, 2008, Deputy Hansen detained Plaintiff awaiting the arrival of the

Border Patrol; (2) that Plaintiff was improperly stopped and detained while driving a

vehicle on January 9, 2008; (3) that Deputy Hansen improperly conducted a visit to

Plaintiff's home, also on January 9, 2008, and (4) that Deputies Hansen and Figueroa

carried out a second illegal traffic stop in March 2008.  [Doc 38 at 12-13]  The Court

addresses these claims in chronological order.

**a.**     **January 2, 2008**

According to Plaintiff, on January 2, 2008, Deputy Hansen participated in an investigation involving a burglary, for which Plaintiff's son was a suspect. [Doc 38 at 7] During the investigation, Plaintiff asserts that Deputy Hansen contacted Border Patrol to check the immigration status of Plaintiff's family and that Plaintiff and her family were required to wait at a substation until Border Patrol arrived. [Doc 38 at 12] Plaintiff contends that this constituted a seizure in violation of the Fourth Amendment. [Id.] Specifically, Plaintiff argues that she was "detained" without "reasonable suspicion or probable cause." [Id.]

For support, Plaintiff cites her own affidavit, an "Incident Narrative," an "Incident Report," and a department call log. [Doc 38 at 7] This evidence does not support Plaintiff's legal conclusion that her detention was unjustified. The "Incident Narrative" was written by Deputy Carrera, who is no longer a party. [Doc 35-7] In the narrative, Deputy Carrera states that he went to Plaintiff's home to investigate Plaintiff's son for a recent burglary. [Id. at 1] Deputy Carrera spoke with Plaintiff's son and husband, and he told them that he would be transporting Plaintiff's son to the substation for questioning and that Plaintiff's husband could come along. [Id.] Plaintiff, her husband, and their young daughter arrived at the substation after Deputy Carrera and Plaintiff's son. [Id.] Deputy Carrera interviewed Plaintiff's son about the burglary. After that, Deputy Carrera wrote that

> For report purposes, I proceeded to ask Mr. and Mrs. Talamantes for identification at which time both produced a State of New Mexico driver's license.  When I asked for their social security number, both Mr. and Mrs. Talamantes said they did not possess one.  Because I could not confirm a positive identification on both, I requested Border Patrol conduct an interview for positive identification.  Upon questions and answers, it was later concluded by Border Patrol Agents, that all of the Talamantes family were undocumented immigrants living in the United States.

[Id. at 2 ("Incident Narrative")]  According to the "Incident Report," Deputy Hansen was acting as Deputy Carrera's supervisor during these events.  [Doc 35-7 at 3]  The department dispatch log indicates that Border Patrol was contacted during the ride from Plaintiff's home to the substation.  [Doc 35-8 at 1]  Based on Deputy Carrera's narrative—and Plaintiff does not maintain otherwise—Border Patrol did not take an active hand until after Deputy Carrera was unable to confirm Plaintiff's identity.

Plaintiff's affidavit does not conflict with the reports of the Deputies; it is simply shorter and less specific.  In her affidavit, Plaintiff states the following:

> On January 2, 2008, Defendant Hansen investigated my son in an alleged burglary investigation.  He told my husband and I to follow him to the patrol station.  Defendant Hansen did not allow my family to leave pending Border Patrol arrival even though I asked him what we had done wrong.  I understood that we were under arrest.

[Doc 35-6]  Plaintiff does not argue that she and her family were forced to go to the police station or that they were transported by the Deputies.  It appears that the family went to the police station to support Plaintiff's son—Plaintiff does not maintain otherwise.

The Supreme Court of the United States has made clear that when the initial

detention is lawful, questioning by the police regarding immigration status is not a Fourth

Amendment violation.  See Muehler v. Mena, 544 U.S. 93, 101 (2005) (holding that

where the initial detention is lawful, and the questioning does not extend the detention,

"no additional Fourth Amendment justification for inquiring about [the defendant's]

immigration status was required").  Plaintiff was at the substation because her son was

being questioned by the police—she was thus lawfully present and answering questions at

the substation.  She does not contend that the Deputy Carrera was without authority to

request her social security number.  After she could not provide a social security number,

Deputy Carrera developed reasonable suspicion regarding Plaintiff's immigration status,

and a limited seizure to facilitate further investigation was permissible.  See United States

v. Peters, 10 F.3d 1517, 1521 (10th Cir. 1993) (stating that Terry v. Ohio, 392 U.S. 1,

(1968) "permits a law enforcement officer to make a limited 'seizure' of an individual

suspected of criminal activity if the officer has 'specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant that intrusion.'"

(quoting Terry, 392 U.S. at 21.)).

Regarding whether the seizure was sufficiently limited, Plaintiff does not indicate

how long she waited for Border Patrol.  According to the dispatch log from January 2,

2008, Deputy Hansen arrived at the substation at 3:02 p.m. and left again to assist Border

Patrol at Plaintiff's residence at 4:12 p.m.  [Doc 35-8]  Thus, considering the time it

would have taken for Plaintiff and her family to arrive and sit in on her son's interview,

Plaintiff would have waited for Border Patrol for less than an hour.  Plaintiff provides no

authority to support her argument that waiting for a period of less than an hour in a small room at a police substation, under these circumstances, is too great an intrusion to be constitutionally borne.  Such a brief intrusion was reasonably warranted by Plaintiff's failure to supply her social security number when asked by Deputy Carrera.  <u>See United States v. Sharpe</u>, 470 U.S. 675, 685 (1985) (observing that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria"); <u>Terry</u>, 392 U.S. at 1.

Accordingly, Plaintiff has failed to demonstrate a clearly established right for a person to immediately leave a police substation after law enforcement is unable to confirm that person's immigration status.  <u>See Swanson v. Town of Mountain View, Colo.</u>, 577 F.3d 1196, 1200 (10th Cir. 2009) ("A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right.").

**b.      January 9, 2008—Traffic Stop**

Next, Plaintiff argues that a traffic stop on January 9, 2008, violated her rights under the Fourth Amendment.  A traffic stop is evaluated according to the principles set forth in <u>Terry</u>.  <u>Amundsen v. Jones</u>, 533 F.3d 1192, 1198 (10th Cir. 2008).  Our Circuit has explained that it is a two-step inquiry, which considers (1) whether "the officer's action was justified at [the stop's] inception," and (2) whether "the officer's subsequent conduct was reasonably related in scope to the circumstances that justified the

interference in the first place." Id. (alteration in original) (internal quotation marks and citation omitted).  Turning to the first prong of the analysis, "[a]n officer may initiate a traffic stop once he has reasonable suspicion that criminal activity is, has, or is about to occur."  United States v. Winder, 557 F.3d 1129, 1135 (10th Cir. 2009) (internal quotation marks and citation omitted).  "Reasonable suspicion arises when an officer of reasonable caution has a particularized and objective basis for suspecting the person stopped of criminal activity judged against the totality of the circumstances."  United States v. Pena-Montes, 589 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citation omitted).

Plaintiff contends that on January 9, 2008, Deputy Hansen conducted a traffic stop without "reasonable suspicion or probable cause."  [Doc 38 at 12]  According to the Petition, Deputy Hansen "targeted" Plaintiff when he saw her driving, conducted a unconstitutional traffic stop, and called Border Patrol.  [Doc 1 at 5]  Defendants maintain that Deputy Hansen was aware that Plaintiff had been recently deported and stopped her vehicle on suspicion that she was illegally in the country.  [Doc 30 at 7]  Indeed, 8 U.S.C. § 1326 (a) & (b) imposes a fine and/or a term in prison for persons who are deported—voluntarily or otherwise—and then reenter the United States.  Thus, when Deputy Hansen observed Plaintiff driving, he had a "particularized and objective basis" for suspecting that she was engaged in criminal activity—violation of Section 1326(a).

In response, Plaintiff makes two arguments.  First, Plaintiff insists that Deputy Hansen knew only that "he turned over Plaintiff's entire family to Border Patrol" but that

he had no "personal knowledge" of Plaintiff's legal status at the time he stopped her vehicle.  [Doc 38 at 5]  In making this argument, Plaintiff fails to grasp the nature of the reasonable suspicion framework.  The inquiry is whether "the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate."  Winder, 557 F.3d at 1134 (internal quotation marks and citation omitted).  The undisputed facts known to Deputy Hansen were (1) that seven days earlier he had assisted Border Patrol while Plaintiff and her family gathered their belongings in preparation for deportation [Doc 35-8 at 1-2; Doc 30-3  at 3] and (2) that Plaintiff was currently present in the United States.  No allegation or evidence suggests that Deputy Hansen was actually present when Plaintiff and her family were removed from the country.  Nevertheless, based on the facts available to Deputy Hansen at the time of the stop, an "officer of reasonable caution" would have believed that stopping Plaintiff's vehicle in order to further investigate her status was an "appropriate" action. Id.

Second, Plaintiff claims that Section 1326 does not provide a basis for the stop because Deputy Hansen, a state law enforcement officer, had no authority to enforce federal immigration law.  [Doc 38 at 5]  Plaintiff provides no authority for the proposition that an on-the-spot analysis of enforcement authority is required before a law enforcement officer is permitted to act on reasonable suspicion of criminal activity.  To the contrary, our Circuit has held that "state law-enforcement officers have the general authority to investigate and make arrests for violations of federal immigration laws."  United States v.

Vasquez-Alvarez, 176 F.3d 1294, 1296 (10th Cir. 1999).

Deputy Hansen had reasonable suspicion that Plaintiff was illegally in the country contrary to Section 1326(a) and thus, the traffic stop was justified at its inception. Plaintiff does not appear to argue that the duration of the stop was unreasonably related to the scope of the initial inquiry, but the Court nevertheless finds that the second prong of the Terry analysis is satisfied.  "In general, an investigative detention complies with the second prong if it last[s] no longer than is necessary to effectuate the purpose of the stop." Amundsen, 533 F.3d at 1200 (alteration in original) (internal quotation marks and citation omitted).  According to undisputed facts, Border Patrol was unable to verify Plaintiff's status, and Deputy Hansen released her.  [Doc 38 at 7-8; Doc 30-3 at 3]  The scope of the stop, therefore, was "carefully tailored to its underlying justification."  Id. (internal quotation marks and citation omitted).  Deputy Hansen suspected that Plaintiff was in the country illegally, he stopped her in order to investigate, she was detained for the time it took him to contact the proper authorities, and she was released when those authorities were unable to determine her status.  Based on these facts, Plaintiff failed to establish that the January 9, 2008 traffic stop violated her constitutional right to be free from unreasonable searches and seizures.

**c.**      **January 9. 2008—Home Visit**

In addition to the traffic stop, a second event occurred on January 9, 2008. Plaintiff argues that Deputy Hansen visited her home in violation of her Fourth Amendment rights.  [Doc 38 at 8]  After Deputy Hansen terminated the traffic stop and

allowed Plaintiff to leave, he received a call from Border Patrol, which instructed Deputy

Hansen to detain Plaintiff at her home.  [Id.; Doc 35-10]  In her response to Defendants'

*Motion*, Plaintiff summarizes events as follows:

> Defendant Hansen proceeded to Plaintiff's home to detain her once again,
> even though he did not have a warrant for her arrest, or a warrant to be in
> her home.  After a Border Patrol supervisor informed Defendant Hansen
> that they did not have a valid reason to issue a warrant to enter Plaintiff's
> home, Defendant Hansen left the residence.  The entire time Defendant
> Hansen remained outside, Plaintiff did not feel free to leave.

[Doc 38 at 8 (internal citations omitted)]

Plaintiff's constitutional argument is that Deputy Hansen did not have a warrant to

search her home or a warrant for her arrest.  Plaintiff, however, does not claim that her

home was searched nor does she indicate that she was arrested.  According to Plaintiff's

evidence, she did not come out of the house, and the officers did not enter.  [Doc 35-6 at

3]  See Akbari v. City of Idaho Springs, 48 F.3d 1231, *5 (10th Cir. 1995) (unpublished)

(concluding that a plaintiff's § 1983 claim could not survive when the undisputed facts

showed that law enforcement officers, based on a reliable tip, knocked on the plaintiff's

door to investigate an alleged dispute but never entered the home).

In addition to these arguments, Plaintiff has averred that Deputy Hansen waited

outside her home for nearly three hours, and she did not feel "free to leave her home."

[Doc 38 at 8]  It is well established that "[a] person has been 'seized' within the meaning

of the Fourth Amendment only if, in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave," United

States v. Reeves, 524 F.3d 1161, 1167 (10th Cir. 2008) (internal quotation marks and citation omitted).  Nevertheless, it is further well established that this "free to leave" test "states a *necessary*, but not a *sufficient*, condition for seizure."  California v. Hodari D., 499 U.S. 621, 628 (1991).  In order to establish a seizure, Plaintiff must also demonstrate that she yielded upon the show of authority by Deputy Hansen.  Id. at 626 ("The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.").  In her affidavit and her response, Plaintiff plainly states that Deputy Hansen "kept screaming and banging on my door to open the door" and that she "refused to open the door."  [Doc 35-6 at 2]  Thus, although a reasonable person might not have felt free to leave under these circumstances, Plaintiff—according to her own submissions—did not yield to Deputy Hansen's show of authority.  Accordingly, despite Deputy Hansen's questionable behavior, Plaintiff was not seized with the meaning of the Fourth Amendment, there was no constitutional violation, and as a result, Deputy Hansen is entitled to qualified immunity with respect to these events.

**d.**      **March 7, 2008**

Last, Plaintiff challenges the basis for a traffic stop that occurred on March 7, 2008.  On that date, Deputy Hansen again observed Plaintiff driving.  Plaintiff contends that the reason for the stop was that "Plaintiff was 'suppose' *[sic]* to have a federal warrant."  [Doc 38 at 8]  She further states the following:

> At the time of the stop, Defendant Hansen asked Plaintiff for her
> identification.  Plaintiff produced her Mexican driver's license.  Defendant
> Hansen advised her that she could not use her Mexican identification and
> accused her of trying to pass off as another person.  This is evidenced by the
> officer's handwritten note on the citation stating 'D subject gave additional
> name, had prior knowledge of that name was Talamantes.'  Since the
> identification stated both Plaintiff's father and mother's last name as it is
> customary in Mexico, she was purposely lead to believe it was illegal to
> carry several last names in the United States as it is customary in Mexico.
> She understood this to be illegal because Defendant Hansen detained her for
> two and a half hours for allegedly giving him the incorrect last name.

[Id. (internal citations omitted)]  Plaintiff appears to challenge the justification for the

stop at its inception, as well as the duration of the detention.  [Doc 38 at 8]

As has been explained, under § 1326(a), Plaintiff was subject to penalty if she re-

entered the United States after having been deported.  Deputy Hansen recognized Plaintiff

as someone who was recently deported and again sought to verify her status.  During his

last encounter with Plaintiff, he had been unable to verify her immigration status.  Based

on the facts known to him at the time, Deputy Hansen had reasonable suspicion to stop

Plaintiff to verify her lawful presence in the United States.

Turning to the second prong of the analysis, as stated earlier, the length of the

detention comports with constitutional protections if it is no longer than necessary to

"effectuate the purpose of the stop."  Amundsen, 533 F.3d at 1200 (internal quotation

marks and citation omitted).  Deputy Hansen stopped Plaintiff in order to verify her

immigration status because he reasonably suspected that she was in the country illegally.

According to the dispatch log, the entire incident took over two hours, but the first thirty

minutes of the encounter were devoted to ascertaining Plaintiff's correct name.  [Doc 35-

12 at 1]  Border Patrol arrived slightly less than an hour after Plaintiff was stopped.  [Id. at 2]  The entire time that Plaintiff complains that she was required to wait was directly related to the purpose of the initial stop—verifying Plaintiff's immigration status.  There is no evidence that the stop was impermissibly expanded.  Accordingly, Plaintiff has failed to show that her constitutional rights were violated with respect to these events.

**e.**      **Qualified Immunity for the Fourth Amendment Claims against Defendants**

Plaintiff states that "[w]here as here, the very facts and circumstance [sic] that are alleged to have provided the officer with reasonable suspicion or probable cause are in dispute."  [Doc 38 at 12]  Plaintiff has attached to her response a memorandum opinion and order filed in a separate case, heard by another judge, which imposes a preliminary injunction on Otero County.  [See Doc 35-5, Border Network for Human Rights v. County of Otero, 07cv1045 (MV/WPL), *Memorandum Opinion And Order* (D.N.M. September 19, 2008)]  That *Order* enjoins the defendants in that action from following activities:

> A. Engaging in any stops, searches or seizures, of persons, property or homes, without a valid legal justification pursuant to Operation Stonegarden.
>
> B. Conducting unlawful community-wide raids targeting low-income Latino residents in Otero County for the sole purpose of identifying and apprehending undocumented and illegal immigrants pursuant to Operation Stonegarden.
>
> C. Engaging in unlawful discriminatory activities and racial profiling for the purpose of identifying and apprehending undocumented and illegal immigrants pursuant to Operation Stonegarden.

D. Engaging in unlawful retaliation, coercion, harassment, threats and intimidation for the purpose of identifying and apprehending undocumented and illegal immigrants pursuant to Operation Stonegarden.

[Id. at 10-11]  A permanent injunction was never entered, as the parties reached a settlement.  [See Border Network, 07cv1045, Doc 81]  The Court has not considered this document as evidence in the present controversy because the Border Network *Order* was filed in September 2009, several months after the events described in the *Petition* allegedly took place, and the *Order* had no retroactive effect.  Nevertheless, the Court notes that Deputy Hansen and Otero County are named defendants in that case, which involved similar allegations.  The Court is troubled by the seeming pattern of harsh and unnecessarily rough treatment of persons residing within our borders.  Despite these concerns, the facts presented by Plaintiff do not demonstrate violations of her clearly established constitutional rights.  Defendants are thus entitled to qualified immunity with regard to these events.

## 2.    Equal Protection

In her *Petition*, Plaintiff alleges that "Defendants deprived Plaintiff of her right to equal protection of the laws" and that "Defendants' actions against Plaintiff were taken with racially discriminatory intent and effect."  [Doc 1 at 9]  Plaintiff's response to Defendants' *Motion* limits the equal protection argument against Defendants to the conduct surrounding the two traffic stops.  [Doc 38 at 13]

Although the Court has determined that the traffic stops were valid under the

Fourth Amendment, this conclusion does not necessarily resolve a "more troubling claim" that the driver was targeted on account of her race.  See Marshall v. Columbia Lee Reg'l Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003).  A claim for racially selective law enforcement draws on "ordinary equal protection standards."  Id. at 1169 (internal quotation marks and citation omitted).  "The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose. . . ."  Id.  Although the discriminatory purpose need not be the only purpose, "it must be a motivating factor in the decision."  Id.  "To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect."  Id.

       In Marshall, the plaintiff presented evidence that a police officer followed him for several blocks, the officer made eye contact when the vehicles were stopped at an intersection, the officer did not provide a nondiscriminatory explanation for his behavior, the officer made cryptic comments referring to drug use, the officer made a note of the plaintiff's race on the citation even though no such note was required, and the officer abandoned his initial allegations of high speed and weaving.  Id. at 1169-70.  The Court stated that these facts presented a "close question" regarding discriminatory intent, but that additional facts further supported the plaintiff's allegations.  Id. at 1170.  The plaintiff also provided evidence of the specific officer's behavior during his prior

employment.  Id.  The officer's previous employer stated in a terminating memo that the officer had "failed to treat people fairly and equally under the law."  Id.  In addition, analysis of the officer's past arrest records showed a pattern of racial discrimination.  Id. at 1170-71.  All of this evidence, our Circuit held, "may be sufficient to create a triable issue on [the plaintiff's] claim of racially selective law enforcement."  Id. at 1171.

Facts that "may" be sufficient are markedly absent in the present case.  Id. Plaintiff contends that because she was stopped so that Deputy Hansen could ascertain her immigration status, the decision to stop her was based solely on her race. Nevertheless, there is no evidence that Deputy Hansen stopped Plaintiff because she looked "Hispanic" and she might therefore be an illegal immigrant.  [Doc 38 at 13]  There is further no dispute that on January 9, 2008 and March 7, 2008, Deputy Hansen recognized Plaintiff as a woman against whom Border Patrol initiated deportation proceedings on January 2, 2008.  Plaintiff recounts no additional facts about any of the encounters that would lead a reasonable juror to infer that Deputy Hansen was motivated by a racially discriminatory purpose.

Plaintiff further argues that because Otero County participated in a program titled Operation Stonegarden and an Operation Stonegarden report was filed after both traffic stops, the already-articulated premises for the stops were pretextual.  According to Plaintiff, Operation Stonegarden provides funding for local law enforcement to initiate, support, and direct a policy, program, and/or custom under which they "identify and detain or arrest Hispanics for questioning by federal immigration officials."  [Doc 1 at 4]

According to Plaintiff's evidence, the mission of Operation Stonegarden is as follows:

> [T]o utilize state and local law enforcement entities, in conjunction with Border Patrol operations, to collaboratively deny the use of routes of egress from the El Paso Sector's AOR in New Mexico and increase law enforcement presence along the border, in an effort to reduce border associated crimes.  It will provide better police service to border residents and serve as a deterrent to cross-border illicit traffic.  The New Mexico Stonegarden operation will utilize Border Patrol as a first line of defense at the border, county Sheriff departments as the second line of defense and city officers and NM State Police as the tertiary line of defense.  This provides the best utilization of the limited funding available to local law enforcement agencies by using existing operational procedures and areas of coverage.

[Doc 38-1 at ]  Despite Plaintiff's references to Operation Stonegarden, it cannot be disputed that the basis for the stops was that Deputy Hansen recognized Plaintiff as an individual who had recently been deported.  Plaintiff has not drawn any factual connection between Otero County's participation in Operation Stonegarden and any pretext on the part of Deputy Hansen or his colleagues in their particular dealings with Plaintiff.

The Marshall Court observed that the standard for establishing a claim for racially selective law enforcement "'is a demanding one.'"  Id. at 1167 (quoting United States v. Armstrong, 517 U.S. 456, 463 (1996)).  Plaintiff has not met that standard, and accordingly has failed to demonstrate that Defendants violated her clearly established right to equal protection under the Fourteenth Amendment.  As a result, Defendants are entitled to qualified immunity on this claim.

**3.**     **Due Process**

Plaintiff makes two claims pursuant to the Due Process Clause of the Fourteenth Amendment.  She contends first that Defendants falsely imprisoned her without due process of law.  [Doc 1 at 9]  Second, she argues that Defendants acted "arbitrarily and without rational basis in a manner intended to injure Plaintiff in an unjustifiable manner and deprive Plaintiff of her right to liberty as secured by the Constitution" and that "the conduct of Defendants shocked the conscience."  [Id. at 9-10]  The Court first addresses the false imprisonment claim.

The Supreme Court of the United States has analyzed a similar claim for deprivation of liberty without due process of law, which was presented as a false imprisonment claim.  See Baker, 443 U.S. at 142-45.  In Baker, the plaintiff was mistakenly arrested on an outstanding warrant for his brother, who had used the plaintiff's name to obtain false identification.  Id. at 140-41.  The plaintiff was in custody for approximately four days before the mistake was discovered, and he was released.  Id. at 141.  The Baker Court determined that absent an invalid arrest warrant—an independent Fourth Amendment violation—"detention of three days over a New Year's weekend does not and could not amount to a . . . deprivation [of due process]."  Id. at 143-44, 145.  Plaintiff has similarly failed to demonstrate that the detentions in the present case violated the Fourth Amendment.  Further, none of the detentions for which Plaintiff holds Defendants responsible lasted for more than an hour.  Based on the guidance offered by Baker, Plaintiff's constitutional claim for false imprisonment fails.

Plaintiff also contends that her rights to substantive due process have been

violated.  It is well established that the Due Process Clause "cover[s] a substantive sphere

. . ., barring certain government actions regardless of the fairness of the procedures used

to implement them."  Seegmiller v. LaVerkin City, 528 F.3d 762, 766-67 (10th Cir. 2008)

(alteration in original) (internal quotation marks and citation omitted).  Our Circuit has

recognized two applications of the substantive due process doctrine:  "[o]ne strand

protects an individual's fundamental liberty interests, while the other protects against the

exercise of governmental power that shocks the conscience."  Id. at 767.

In her response to Defendants' *Motion*, Plaintiff states that she has been denied a

"fundamental liberty interest" because the sole reason for the traffic stops was her "race

or ethnicity."  [Doc 38 at 14]  The Supreme Court of the United States, however, has

limited the applicability of substantive due process protections in the following manner:

"[w]here a particular Amendment provides an explicit textual source of constitutional

protection against a particular sort of government behavior, that Amendment, not the

more generalized notion of substantive due process, must be the guide for analyzing these

claims."  County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (internal quotation

marks and citation omitted)) (Lewis).  Plaintiff's substantive due process claim stems

from two allegedly pretextual traffic stops.  Such allegations are properly brought under

either the Fourth Amendment or the Fourteenth Amendment's Equal Protection Clause.

See Marshall, 345 F.3d at 1166 (analyzing whether the officer had probable cause for the

stop and whether the officer targeted the plaintiff based on his race).  Because Plaintiff's

factual allegations are covered by "an explicit textual source of constitutional protection,"

she can establish no "more generalized" constitutional right under the rubric of

substantive due process.  Lewis, 523 U.S. at 842.

**4.      Conspiracy**

Last, Plaintiff brings a claim against Defendants for conspiracy pursuant to 42

U.S.C. § 1985.  [Doc 1 at 10]  The relevant provision of § 1985 "generally describes a

conspiracy of two or more persons for the purpose of depriving another of equal

protection of the laws or equal privileges and immunities under the laws."  Dixon v. City

of Lawton, 898 F.2d 1443, 1447 (10th Cir. 1990).  "The essential elements of a § 1985(3)

claim are:  (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges

and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or

deprivation resulting therefrom."  Kelley v. City of Albuquerque, 375 F.Supp.2d 1183,

1205 (D.N.M. 2004) (quoting Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993)).

"[I]n the absence of allegations of class based or racial discriminatory animus, the

complaint fails to state a claim under § 1985."  Bisbee v. Bay, 39 F.3d 1096, 1102 (10th

Cir. 1994) (alteration in original) (internal quotation marks and citation omitted).

Plaintiff again points to Defendants' participation in Operation Stonegarden and "a

number of operations meant to identify and detain or arrest Hispanics for questioning by

federal immigration authorities."  [Doc 38 at 15]  Plaintiff does not dispute, however, that

on January 2, 2008 she was present at the police station because her son was being

questioned regarding a burglary.  Plaintiff does not dispute that Deputy Hansen

recognized her on January 9, 2008 as a person who had been recently deported.  Plaintiff

does not dispute that Deputy Hansen again recognized her on March 7, 2008.  Completely

absent from the current record is any evidence that Defendants operated with "invidiously

discriminatory animus."  Id.  Instead, Defendants' encounters with Plaintiff did not result

in constitutional violations, and as a result, Plaintiff cannot establish a claim under §

1985.  See Kelley, 375 F.Supp.2d at 1219 (ruling that a § 1985 claim cannot lie where the

Court has already determined that there was no underlying constitutional violation).

**B.**    **Rule 56(f)**

Fed. R. Civ. P. 56(f) provides that "[i]f a party opposing the motion shows by

affidavit that, for specified reasons, it cannot present facts essential to justify its

opposition, the court may . . . order a continuance to enable affidavits to be obtained,

depositions to be taken, or other discovery to be undertaken. . . ."  A party seeking to

defer a ruling on summary judgment under Rule 56(f) must file an affidavit that

"explain[s] why facts precluding summary judgment cannot be presented.  This includes

identifying the probable facts not available and what steps have been taken to obtain these

facts."  Trask v. Franco, 446 F.3d 1036, 1042 (10th Cir. 2006) (internal quotation marks

and citation omitted).  Although a summary judgment movant's exclusive control over

information is a factor in the analysis, "[e]xclusive control does not ... require automatic

relief under Rule 56(f)."  Trask, 446 F.3d at 1042 (alteration in original) (internal

quotation marks and citation omitted).

With regard to Plaintiff's Fourth Amendment claims, the best source of

information for such allegations is Plaintiff herself.  She was present during each of the

incidents and could attest to the facts that would support her claims for violations of the

Fourth Amendment.  Accordingly, additional discovery is not required to address

Plaintiff's Fourth Amendment claims against Defendants.  See Skrzpczak v. Catholic

Diocese of Tulsa, 2010WL27395536,* 8, No. 09-5089 (10th Cir. July 13, 2009).  In

addition, the Court has determined that Plaintiff, as a matter of law, cannot establish a

claim for substantive due process or false imprisonment.

Plaintiff's claims pursuant to the Equal Protection Clause and § 1985 require a

demonstration of discriminatory intent, evidence of which is difficult to come by.

Nevertheless, the burden described in Marshall to establish a claim for racially selective

law enforcement is so high that given the facts already sworn by Plaintiff, she could not

discover evidence sufficient to withstand the burden.  In Marshall, the plaintiff described

a number of facts within his personal knowledge, related to the alleged incident, that

could lead to an inference of racial animus.  These facts, *in addition* to the other materials

relating to the officer's history, were potentially sufficient to "create a triable issue."  345

F.3d at 1171.  Plaintiff has averred no facts from the encounters that would lead to an

inference of racial motivation.  Thus, the additional discovery of anything in Defendants'

history relating to racial animus would not add up to enough evidence to support a claim

for racially selective law enforcement.  Further, based on the failure of Plaintiff's

underlying constitutional claim for violations of equal protection, additional discovery

would not aid Plaintiff's § 1985 claim.  See Kelley, 375 F.Supp.2d at 1219 (ruling that a §

1985 claim cannot lie where the Court has already determined that there was no

underlying constitutional violation).

### III.    CONCLUSION

For the reasons stated above, the evidence viewed in the light most favorable to

Plaintiff fails to demonstrate that her constitutional rights were violated.

**IT IS THEREFORE ORDERED** that *Defendants' Motion For Partial Summary*

*Judgment Based On Qualified Immunity* [Doc 30] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion For Relief Under Fed Rules*

*Civ Proc R 56(f)* [Doc 44] is **DENIED**.

**SO ORDERED** this 29th day of October, 2010, in Albuquerque, New Mexico.


_____
M. CHRISTINA ARMIJO
United States District Judge